### In re CARLISLE HOMES, INC., Debtor–in–Possession.

### Glassboro Housing Associates, Debtor–in–Possession.

### CARLISLE HOMES, INC., and Glassboro Housing Associates, Plaintiffs,

v.

### Eleanor B. AZZARI and Teramo Corporation, Inc., Defendants.

Bankruptcy Nos. 88–01170, 88–01171.
Adv. No. 88–0879.

United States Bankruptcy Court,
D. New Jersey.

Dec. 30, 1988.

---

Riker, Danzig, Scherer, Hyland & Perretti by Dennis J. O'Grady, Warren J. Martin, Jr., Morristown, N.J., for debtors-in-possession.

Hannold, Caulfield, Marshall & McDonnell by Walter Marshall, Jr., Woodbury, N.J., Adelman, Lavine, Gold & Levine by Gary D. Bressler, Philadelphia, Pa., for defendants, Teramo Corp. and Eleanor B. Azzari.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

There are three matters before the court: (1) debtors' motion for summary judgment on their verified complaint to compel specific performance and for damages; (2) debtor, Glassboro Housing Associates' motion to assume a certain option contract; and (3) defendants' cross-motion for summary judgment on debtors' specific performance complaint. This court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334 and 157. Because the court approves the Glassboro's assumption of the option agreement at issue, and finds relief ·in the form of specific performance appropriate in this case, debtors' motions are hereby granted and defendants' cross-motion for summary judgment is denied. The following constitutes this court's findings of fact and conclusions of law.

### I. *Findings of Fact*

On March 18, 1988, Glassboro Housing Associates ("Glassboro") and Carlisle Homes, Inc. ("Carlisle") (hereinafter collectively referred to as "debtors") filed voluntary Chapter 11 bankruptcy petitions pursuant to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 and the Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986 ("Bankruptcy Code") and were thereafter continued as debtors-in-possession. On the same day this court entered an order for joint administration of the cases. The debtors are engaged in the business of ownership, development and construction of 230 residential homes on certain real property located in the Borough of Glassboro, Gloucester County, New Jersey.

On October. 29, 1983 Teramo Corporation ("optioner") and Robert G. Welch ("optionee") executed an option agreement wherein Teramo granted Welch the right to acquire from Teramo approximately sixty-one (61) acres of land located in the Borough of Glassboro (the "Option Property") for an aggregate purchase price of $595,-000.00 (the "Option"). On October 30, 1983, Welch assigned his interest in the option agreement to Glassboro Housing Partnership. The master Option agreement permitted exercise of the Option in increments. The expiration date on the master option was October 29, 1988. The relevant terms of the agreement provide:

## Grant of Option

1. For the consideration expressed in Paragraph 5 of this Option Contract, Optionor hereby grant to Optionee his successors and assigns the exclusive and irrevocable right and option to purchase, during the option period, the property described in Exhibit A at the price and under the terms set forth below:

(1) a portion of the Property ("Initial Conveyance") as designated by the Optionee sufficient to adequately provide for at least two (2) sample modular units and access roads thereto presently contemplated to be an area of approximately three acres which will include ground area sufficient for a roadway across the Property as required by the Glassboro Planning Board;

(2) thereafter individual "lots" of the property. Each "lots" to consist of. an area as designated by the Optionee of ground within the Property sufficient for a single family home as shown in final architectual drawings as approved by the Glassboro Planning Board with or within the Property together with enough land to provide the necessary access roads and common areas in relation to each.

## Option Period

2. The total option price for the Property shall be Six Hundred Thousand ($600,000.00) Dollars due and payable as follows:

(1) Five Thousand Dollars ($5,000) for the "Initial Conveyance" payable at the time such portion of the Property is conveyed to the Optionee:

(2) As each option is exercised in respect to each individual lot the total price per lot shall be an amount to which bears the same ratio of Five Hundred Ninety Five Thousand ($595,000) Dollars as the number one bears to the total number of lots provided in the final architectual drawings as approved by the Glassboro Planing Board such price to be paid due at the time each such lot is conveyed to the Optionee.

(3) The terms of the sale shall be in conformity with the Option Contract and the Agreement of Sale which is attached hereto and shall be considered a part hereof.

The option to purchase the property shall commence as of the time of execution of this contract and continue until 12 o'clock a.m. on 29th day of October, 1988.

## Automatic Termination

3. If Optionees fail to exercise the option in accordance with the terms of this Option Contract within the option period or any extension thereof, then the option to purchase granted by this Option Contract, and the rights thereunder of Optionees, shall automatically and immediately terminate without notice.

## Time of the Essence

4. Time is of the essence with respect to any time fixed for performance of any requirement set forth in this Option Contract.

## Consideration

5. This option is granted in consideration of Optionee's payment to Optionors of the sum of ($1.00) receipt of which is hereby acnowledged.

5.A. If the project contemplated by Glassboro in relation to the Property has not commenced as signified by the commencement of construction of modular units on the Property within eighteen (18) months of the date hereof this Agreement will be null and void unless extended in writing by the parties hereto.

\* \* \* \* \* \*

## Exercise of Option

8. The Optionee may exercise this option at any time during the option period by execution and tender by personal delivery or by mail to Optionor of the real estate sales contract attached hereto as Exhibit B. Optionors shall forthwith execute and deliver to Optionees and executed copy of said contract within five (5) days.

### Assignability of Option

9. Optionee may assign this option. The assignment shall be effective as to Optionor on written notice thereof by Optionees to Optionors.

### Further Conditions of this Option

10. The Optionee [sic] does by this Agreement grant the following further rights to the Optionee;

(1) Optionor grants by this agreement to Optionee all the necessary easements and access rights to complete the Project which is presently contemplated to include approximately 400 modular residential homes.

(2) The master option described above will be treated as and may be exercised as a group of individual options one option per each "lot" and one option for the Initial Conveyance;

(3) Optionor agrees that each option shall be exercised singly and independently of the other options concurrently, collectively, not according to any order or not at all as the Optionee shall determine in its sole judgment regardless of the opinions of others.

(4) Title to the Property and the individual lots will be conveyed, whether in bulk or as individual lots, free and clear of all liens, encumbrances or restrictions which may effect the use of the property as single family homes.

(5) Optionor will modify the existing mortgages, in order to provide the release of said mortgage of lien against each lot and common areas as they are conveyed to the Optionee in conformity with this agreement of even date herewith and attached hereto and executed by the Mortgagee, Fred Gravino, Esq. and the Mortgagor Teramo Corporation.

(6) Optionee warrants the zoning and other restrictions on the property are presently as will permit the erection and occupancy of at least four hundred modular home units on the Property.

(7) All closing cost normally borne by the Seller shall be borne by the Optionor upon purchase of the individual parcels and common areas subject to the option.

(8) Settlement on the individuals lots shall be within thirty (30) days of the exercise of each option or as mutually agreed in writing by the parties;

(9) This Agreement may as recorded and is binding on the heirs, successors and assigns of the parties.

### Encumber

10. Optionor during the term hereof shall not do anything to alter an encumber the property nor perform nor fail to perform any act which will affect in any way the development of the property as a residential development or prevent or inhibit in any way the erection thereon of at least four hundred modular home units.

### Notices

11. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing or by certified mail, postage prepaid, return receipt requested, and shall be deemed received as of the day of mailing, Mailed notices shall be addressed as set forth below, but each party may change his address by written notice in accordance with this paragraph.

In 1984, Glassboro initially exercised the Option, in part, and acquired three acres of Option Property from Teramo Corporation. The deed related to this property transfer is in the name of Glassboro Housing, although the corporate grantor's signature thereon has never been acknowledged or notarized.

In October 1985, Glassboro again exercised the Option, in part, and acquired forty lots (or approximately 13.1192 acres) for the principal sum of $130,000.00. Thereafter, the debtors constructed and sold nine housing units and lots and substantially completed another three housing units on the 13.1192 acres prior to the filing of the bankruptcy petition. The debtors also substantially improved twenty-eight lots by installing sewer lines, streets and other real estate improvements.

Defendant Eleanor B. Azzari is the president of Teramo Corporation, and by way of deed dated December 31, 1986 is the present record owner of that portion of the Option Property not already conveyed to Glassboro (i.e., approximately forty-five acres).[1] On October 11, 1988, Glassboro attempted to exercise the Option and acquire the remaining Option Property by notifying Azzari, her attorney, Walter L. Marshall, Jr., Esquire, and Teramo of its intention to so do. Glassboro set the closing of title for the Option Property for October 26, 1988 and forwarded a Contract of Sale ("Contract") for its purchase to the defendants for execution, in accordance with the terms of the Option Contract. The letter of intent to exercise the option was forwarded to Walter L. Marshall, counsel for Teramo and Azzari, from Dennis J. O'Grady, counsel to the debtors, and read as follows in relevant part:

Pursuant to paragraph 8 of the real estate purchase option contract dated October 29, 1983 by and between Teramo Corporation, as optioner, and Robert G. Welch or his assignee, as optionee, Glassboro Housing Associates, as the assignee of Robert G. Welch, hereby delivers to you three executed copies of a real estate sales contract to be executed and returned to us by Tuesday, October 18, 1988.

In addition, so that we can prepare you for a closing on Wednesday, October 26, 1988, would you please inform us as to the amount of real estate taxes, rents, water, sewer costs, and transfer taxes, if any, to be apportioned at the time of settlement. Also, would you please provide us with a metes and bounds description of the remaining property.

By way of letter dated October 20, 1988 and received by Mr. O'Grady on October 27, 1988, Mr. Marshall responded to Mr. O'Grady's correspondence and indicated: (1) that Teramo Corporation and Azzari's

position was that the option was null and void due to its termination prepetition, due to various actions by the debtors; (2) it did not appear that the debtors could perform the Contract; (3) the debtors had not obtained the requisite court order for execution of the contract nor has shown adequate assurance of future preference; (4) no taxes have been paid by Teramo Corporation or Mrs. Azzari; (5) the figures relating to taxes, rents, water and sewer costs and transfer taxes could be obtained from the Gloucester County Clerk and from the local municipal tax collector; and (6) an adequate legal description of the premises will be supplied at the time of closing.

On October 25, 1988, debtors filed a complaint to compel specific performance and for damages, alleging, inter alia, that defendants, although able, are unready and unwilling to convey title to the Option Property and are therefore in breach of their obligation under the Option. The debtors further allege that the Option Property is unique and essential to the debtors' successful reorganization. By way of complaint the debtors demand relief in the form of:

(1) Preliminarily restraining the defendants from transferring or attempting to transfer the not yet conveyed portion of the Option Property (approximately forty-five acres), pending entry of judgment herein;[2]

(2) Requiring the defendants to specifically perform their obligations in accordance with the terms of the Option, including the delivery of a recordable deed to the debtors for the not yet conveyed portion of the Option Property and their acceptance of the option price of $520,-751.36.

(3) Requiring the defendants to deliver a recordable deed to the debtors for the three acres acquired by them from defen-

---

1. Eleanor B. Azzari is the owner of the property at issue. Prior to owning the property individually, Teramo Corporation owned the property. Azzari was the sole shareholder, director and officer of Teramo Corporation and transferred the property to herself.

2. The court entered an order on October 28, 1988 temporarily enjoining and restraining defendants from transferring or encumbering the subject properties, which order has been continued pending the outcome of these proceedings.

dants in 1984, by having the grantor's signature thereon notarized;

(4) Requiring the defendants to reimburse the debtors for all attorneys' fees, costs and other charges they have and will incur as a result of defendants' actions.

The debtors have calculated the purchase price pursuant to the Option at $520,751.36 as follows:

| | | |
|---|---|---|
| Unpaid option price | | $465,000.00 |
| | | |
| Taxes – 412 G6 | $ 17,771.57 | |
| 412 G17 | 93,731.15 | |
| | | |
| Glassboro's | $111,502.72 | |
| Portion of Taxes× | .50 | $ 55,751.36 |
| | TOTAL | $520,751.36 |

On November 4, 1988 the debtor Glassboro filed a motion to assume the Option Agreement. On November 14, 1988 debtors filed a motion for summary judgment on the principal specific performance complaint. In brief, the debtors argue that they rightfully exercised and thereby assumed the Option under both substantive state law and federal bankruptcy law, and that this court should therefore approve the assumption of the option agreement and at the same time order the defendants to specifically perform the option agreement. By its summary judgment motion the debtors seek an order directing the defendant, Eleanor B. Azzari and Teramo Corporation, to specifically perform pursuant to the real estate option contract dated October 29, 1983 by (1) executing and returning the real estate sales contract forward to them by Glassboro on October 11, 1988; (2) closing title at a time and place specified by the Court within thirty (30) days from Glassboro's receipt of the real estate sales contract executed by defendants; and (3) directing defendants to properly acknowledge the signature of the corporate grantor on the 1984 deed to Glassboro Housing Associates.

On November 16, 1988 defendants Teramo Corporation and Eleanor Azzari filed an answer to debtors' complaint. On November 22, 1988 defendants filed objections to the debtors' motion to assume the option agreement. On November 23, 1988 defendants filed a "Cross–Motion for Summary Judgment on Debtors' Verified Complaint to Compel Specific Performance and For Damages and Opposition to Debtors' Motion for Summary Judgment." By that motion the defendants seek an order dismissing the debtors' verified complaint with prejudice. In brief, the defendants' position is that:

(1) the Option Contract was terminated prior to the filing of the Debtor Glassboro's bankruptcy petition by virtue of the breaches committed by the Debtor;

(2) the Debtor failed to obtain Bankruptcy Court approval for the assumption of the Option Contract prior to its expiration date on October 29, 1988;

(3) the Debtor's inability to perform the contract on November 28, 1988 because the Debtor lacks sufficient funds to exercise the option constitutes an anticipatory breach of the Option Contract; and

(4) the Debtor has failed to cure existing defaults or to provide adequate assurance of cure and future performance as required by 11 U.S.C. Section 365(b)(1).

This court heard oral argument on the parties' motions on November 28, 1988. Oral testimony was given by Krishnamurthy Sankaran, president of S & M Development Enterprises, Inc. ("S & M"), general partner of Glassboro Housing Associates and president of Carlisle Homes, Inc.; and Eleanor B. Azzari, owner of the real property at issue.

Sankaran testified that purchase of the Option Property (i.e., approximately 45 acres) would be beneficial to the debtors' estate because it would provide the necessary funds to pay the debtor estates' unsecured creditors as well as equity holders. Sankaran testified that the debtors were seeking financing in the approximate amount of $600,000.00 to close on the Option Property and that the debtors were prepared to obtain such financing from two sources.

According to Sankaran, $400,000.00 would come from Berkshire Financial Cor-

poration ("Berkshire"). A commitment letter, dated November 16, 1988, from Joseph Cohen, Berkshire's president, to Carlisle Homes, Inc., was marked into evidence as Exhibit D–1. Exhibit D–1 indicates Berkshire's agreement to lend $400,000.00 to Carlisle Homes and sets forth the relevant terms of the loan as follows:

1. Carlisle will execute a promissory note, payable to Berkshire, in the amount of $400,000.00, personally guaranteed by Krishnamurthy Sankaran and Meera Sankaren, his wife. ("Guarantors"). The note will provide for Carlisle to pay interest on a monthly basis at the rate of 10% over the New York prime bank rate for 12 months. At the end of 12 months, the principal and any accrued interest will become due. There will be severe late charges, default provisions and prepayment penalties in this note. At the end of the 12 months, if Carlisle is current with interest payments and if Carlisle pays to Berkshire $80,000.00 against the principal sum of $400,000.00, then Berkshire will extend the loan for an additional year on the same terms and conditions.

2. Carlisle will grant to Berkshire a first mortgage in the amount of $400,-000.00 on 47 acres in Glassboro, New Jersey known as "Phase III". Carlisle represents that this property is zoned for single family residential use and that 4 houses per acre can be built on this property. Should this representation be false, the commitment will be void. This property currently is owned by Eleanor B. Azzari and is known as Lots 6 and 7, Block 412G on the tax map of Glassboro.

3. Krishnamurthy Sankaran and Meera Sankaran will grant to Berkshire a fourth mortgage in the amount of $400,-000.00 on property known as 300 Peachtree Street, Ridgefield, Connecticut.

4. Krishnamurthy Sankaran will grant to Berkshire a second mortgage in the amount of $400,000.00 on property known as 14 Alfred Court, Glassboro, New Jersey.

5. All three mortgages must be insured by a title insurance company, acceptable to Berkshire, and Carlisle and the guarantors must sign any documents required by such title company, including appropriate affidavits of title and corporate resolutions.

6. Carlisle agrees to pay for all expenses in conjunction with the loan transaction, including but not limited to a 1% attorney's fee for Berkshire's attorneys, title insurance premiums, recording fees, and broker's fee to Advanced Funding Corp.

7. Guarantors and Carlisle will sign a guaranty agreement in a form acceptable to Berkshire.

8. Guarantors will obtain endorsements to their fire insurance policies in the properties referred to as paragraphs 3 and 4 naming Berkshire as mortgagee-payee.

9. In the event that attorneys for Berkshire Financial Corp. require an order of the bankruptcy court approving any part of this transaction, Carlisle agrees to provide such an Order.

By subsequent Certification filed by Sankaran on December 7, 1988 in support of Glassboro's pending request for § 364(c) financing S & M Development Enterprises, Inc., the general partner of Glassboro Housing Associates was substituted for Carlisle as the proposed borrower. Sankaran testified that he was prepared to take on the financial obligations as outlined in the Berkshire commitment letter.

Sankaran further testified that he received a commitment in the amount of $200,000.00, the balance of funds necessary for closing, from one Rajendra Prasad, M.D., a limited partner in Glassboro. Dr. Prasad's letter of commitment was marked into evidence as Exhibit D–2 and provides in relevant part:

I also know that there has been a written offer to buy the project from the law offices of Harris Y. Cotton. In the event that the buyers back out, I am willing to come up with cash of up to $200,000 as a loan from the pension plan of Rajendra Prasad, M.D., Inc. and I am the sole shareholder of the corporation. I will loan this money only if the buyers back out for some reason and also upon

terms acceptable to my attorney, Mr. Peter Ragan.

According to Sankaran, Prasad is seeking a reasonable return on his investment of approximately 10–12% interest rate, and a second mortgage on the option property, which Sankaran indicated the debtors were prepared to extend. In fact, such financing application was filed on behalf of the debtors on December 7, 1988 and is pending before this court.

Sankaran also testified that he was prepared to apply to the court for approval of the foregoing financial arrangements as soon as possible. Sankaran further testified that the debtors had received a $2.7 million offer for Glassboro's entire tract of land (i.e. approximately 60 acres, including the Option Property) from Johnston Development Group Inc. (*See* Exhibit A–3) and that one Vincent Russo has also shown "sincerity and intent in pursuing the sale" of the Option Property in the amount of $1.9 million. (*See* Exhibits A–1 and A–2). Sankaran further testified that should the court approve a sale in the amount of $2.7 million, there would be produced a 100% return to all creditors.

Eleanor B. Azzari testified that it was her understanding of the real estate purchase option agreement that the buyer of the property would obtain approval from the Glassboro Planning Board to build individual modular houses on the entire 60 acres at issue. Azzari testified that the parties initially agreed to build 400 units, but that the Planning Board would only approve the construction of 120 single family units plus 96 townhouses, 24 duplexes and an eight and a half acre shopping center.

Azzari testified that in connection with Glassboro's initial purchase of three acres under the option it was her belief that Glassboro was to obtain subdivision approval and erect two modular houses thereupon. Azzari further testified that she would affix Teramo Corporation's corporate seal to the 1984 deed when the property was subdivided. Defendant claims that she continues to be taxed on the improvement made by the debtor on the three acres.

With respect to the 1985 exercise of the Option and the debtors acquisition of approximately 13 acres thereunder, Azzari indicated that the parties agreed at closing that the debtor would put up houses on the property. According to Azzari, she insisted that the debtor obtain subdivision approval prior to closing on the 13 acres, which the debtor apparently did.

Mrs. Azzari also testified that in June 1985 Mr. Sankaran caused a farmer to be ejected from the subject property which in turned caused her to lose a farmland tax assessment, which assessment is considerably lower than standard real property taxes. Azzari stated that the total amount of tax liability created by the rollback assessment and Glassboro's failure to subdivide exceeds $100,000.00. On or about October 29, 1985 the following addendum to the Option was executed by and between the parties:

THIS ADDENDUM AGREEMENT, dated October 29, 1985 by and between TERAMO CORPORATION, a Corporation of the State of New Jersey, and GLASSBORO HOUSING ASSOCIATES, a Pennsylvania limited partnership.

WITNESSETH:

WHEREAS the above named Agreement provides for the determination of purchase price of individual lots to be determined by the percentage of each lot to a designated total lots; and

WHEREAS the above named Agreement does not consider the question of roll back taxes on the farm assessment of said premises;

THEREFORE, it is agreed as follows:

1. That the price for future conveyance of all real estate shall be determined on a per acre basis, it being agreed that the premises consists of sixty-one and twenty-eight one thousandth (61.028) acres, and the price per acre shall be one sixty-first and twenty-eight thousandth (1/61.028) of FIVE HUNDRED NINETY FIVE THOUSAND ($595,000.00) DOLLARS.

2. That all assessments of roll back taxes will be divided equally between the parties on all future conveyances. (A-5). Azzari testified that she believed that the October 29, 1985 addendeum was executed as a result of the failure of the Glassboro Planning Board to approve the building of 400 units on the property. Azzari also testified that no conveyances were made under the Option after the execution of the addendum.

Finally, Azzari testified that in connection with a summary judgment entered by the Superior Court of New Jersey against the debtors in connection with 1985 and 1986 real property taxes assessed against the three acre parcel of land acquired by the debtor, Carlisle Homes tendered to the Teramo Corporation, Check # 1402 dated November 21, 1987 in the amount of $4,230.60 on account of said taxes. Azzari admitted that the funds in question were not applied to satisfy any portion of the tax assessment.

## II. *Conclusions of Law*

The parties' motions in this case present the following questions: (A) whether the option agreement at issue is executory for purposes of § 365; (B) if so, whether the debtor Glassboro herein effectively exercised the option thereby assuming the same for purposes of § 365;[3] (C) if so, whether the option agreement merits approval by this court; and (D) whether summary judgment on debtors' specific performance complaint, in favor of either the debtors or the defendants, is appropriate.

### A. *Executory Contract*

Section 365 of the Bankruptcy Code gives the debtor the authority to assume or reject an executory agreement subject to court approval. 11 U.S.C. § 365(a). Section 365 provides in relevant part:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

. (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

The purpose of § 365 is, in part, to enable the debtor to take advantage of favorable agreements that benefit the estate. The Bankruptcy Code does not define "executory contract." The legislative history of § 365, however, is instructive as to the meaning of the term in the bankruptcy context. An executory agreement is one "on which performance remains due to some extent on both sides." Notes on Committee on the Judiciary, S.R.Rep. No. 96–989, 95th Cong., 2d Sess. 58 (1978), contained in 1978 U.S.Code Cong. & Admin. News 5787, 5844. Many courts have relied upon the definition of an executory contract developed by Professor Countryman:

[A] contract under which the obligation of both the bankrupt and the other party of the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.

Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn.L.Rev. 439, 460 (1973); *see e.g., In re Alexander*, 670 F.2d 885, 887 (9th Cir.1982).

■ The court in *Shaw v. Dawson*, 48 B.R. 857 (D.N.M.1985) noted that "... Congress intended the term [executory con-

---

**3.** 11 U.S.C. § 365 expressly refers to the trustee's obligations but is made applicable to a chapter

11 debtor in possession by virtue of 11 U.S.C. § 1107(a).

tract] to be defined as a contract 'on which performance remains due to some extent on *both* sides.' " *Id.* at 859 (citations omitted; emphasis added). Accordingly, a contract is not executory if fully performed on one side prior to bankruptcy.

In the case of *In re Alexander,* 670 F.2d 885, the Ninth Circuit found that a certain real estate contract was "substantially unperformed" and thereby "executory" where the plaintiff had not paid the purchase price and the debtor had not delivered title or possession at the time the bankruptcy petition was filed. *Id.* at 887. In the case of *In re Jackson Brewing Co.,* 567 F.2d 618 (5th Cir.1978), the Fifth Circuit found that an option to purchase real property was a burdensome executory contract and that the district court in Chapter X reorganization proceedings properly authorized the trustee to reject the contract. *Id.* at 620.

■ Applying the foregoing principles to the case at bar it is clear that the Option Agreement at issue is executory for purposes of 11 U.S.C. § 365. Substantial performance remains on both sides of the master Option Agreement. To date only approximately sixteen acres of the sixty-one acres subject to the Option Agreement, have been purchased by the debtors and delivered by the defendants.[4] In short, the Option has not yet been exercised with respect to a full 45 acres.

### B. Assumption of the Executory Contract

■ New Jersey substantive law governs the question of whether the Option was effectively exercised by Glassboro and represents a protected property interest of the debtor, for purposes of § 365. *See In re Intermet Realty Partnership,* 26 B.R. 383, 387 (Bankr.E.D.Pa.1983). Where an option agreement expressly indicates the time and manner in which it is to be exercised, strict adherence is required by the optionee in exercising the option. *Robert*

*and Richard Associates v. The State of New Jersey,* 202 N.J.Super. 352, 365, 495 A.2d 141 (App.Div.1985), *cert. denied,* 102 N.J. 382, 508 A.2d 245 (1985).

■ As to the time in which the herein option was to be exercised, the Option expressly provides that it shall "continue until 12 o'clock a.m. on the 29th day of October, 1988." (*See* Option at ¶ 2 (3)). As to the manner of its exercise, the Option expressly permits the optionee to exercise the option "by execution and tender by personal delivery or by mail to Optioner of the real estate sales contract...." (*See* Option at ¶ 8). By way of letter dated October 11, 1988 Glassboro informed Azzari, Teramo Corporation and their attorney of its intention to exercise the option, and also set forth a date for closing of title of October 26, 1988. Pursuant to the Option Agreement, the debtors forwarded three executed copies of the contract of sale for its performance along with its October 11, 1988 letter of intent. This court finds that in doing so, Glassboro was in strict compliance with both the time and manner terms of the Option Agreement and therefore effectively exercised the Option at issue under substantive New Jersey law.

■ Effective assumption of an executory agreement depends further on compliance with the Bankruptcy Code. The trustee or debtor in possession may assume or reject an executory contract for purposes of § 365(d)(4) by "clearly communicating in an unequivocal manner its intention to either assume or reject to the [offeror]." *In re 1 Potato 2, Inc.,* 58 B.R. 752, 754–55 (Bankr.D.Minn.1986). This is so as long as the debtor manifests an "unconditional and unambigious decision." *Id.* at 755, *citing In re Bon Ton Restaurant & Pastry Shop, Inc.,* 52 B.R. 850, 854 (Bankr. N.D.Ill.1985). For purposes of § 365(d)(4), a debtor's action of assuming a contract is complete before court approval is obtained. *In re By Rite Distributors, Inc.,* 55 B.R. 740, 742–43 (D.Utah 1985), *cited with approval in 1 Potato 2,* 58 B.R. at 755.[5]

---

4. The court here notes that the defendants have also not effectively delivered title to the debtors

with respect to the three acres purchased by Glassboro under the Option in 1985.

"Court approval, therefore, in effect is not a condition precedent to an effective assumption or rejection but rather, the statutory language in section 365(a) serves to indicate that the decision of the trustee or debtor-in-possession, and its business judgment, is subject to review and possible reversal by the court." *1 Potato 2*, 58 B.R. at 755. The underlying rationale for the court's decision in *1 Potato 2*, is that:

> Section 365 contemplates two distinct actions, one by the trustee (or debtor in possession) and one by the court. The trustee assumes or rejects, and the court approves. The Code does not specify how the trustee is to assume or reject a lease, but the trustee's action is different from the court's. Such is the import of section 365(a), which says that "the trustee, subject to the court's approval, may assume or reject any ... unexpired lease of the debtor."

*Id. Citing In re By–Rite Distributors, Inc.*, 55 B.R. at 742.

 In view of the foregoing, this court finds that the debtor Glassboro herein unequivocally, unconditionally and unambiguously conveyed its intention to assume the Option Agreement at issue by virtue of its letter to the defendants dated October 11, 1988 and by virtue of the filing of its motion to assume the Option Agreement on October 28, 1988 and thereby effectively exercised the Option at issue under bankruptcy law.[6] Both of these actions took place prior to the Option deadline of October 29, 1988. In so finding, the court rejects the defendants' argument that court approval must actually be obtained by the debtor before the option expires in order for the assumption to be effective.

 Defendants argue that Glassboro cannot exercise the Option because it failed to obtain Bankruptcy Court approval for assumption prior to the expiration date of October 29, 1988. In support of their argument defendants rely upon the case of *In the Matter of Coastal Industries, Inc.*, 58 B.R. 48 (Bankr.D.N.J.1986), wherein the court held that § 365(d)(4) requires that the bankruptcy court hear, decide and grant any extension of time to assume or reject a lease of nonresidential real property within the original sixty days following the entry of the order for relief in order to avoid the rejection of the lease by operation of law. *Id.* at 51. This court, however, finds that the debtor's effective assumption of the Option Agreement, bankruptcy court approval notwithstanding, was sufficient to invoke their rights thereunder. The court agrees with the rationale of the court in *1 Potato 2* that under § 365 the debtor's action is different from the court's and that as long as the debtor conveyed its unequivocal intention to exercise the option to the defendant prior to the option's expiration, it has conformed with the requirements of § 365(a) and need merely wait for the bankruptcy court's approval in this regard.

Defendants also rely upon the case of *Matter of Compass Development, Inc.*, 55 B.R. 260 (Bankr.D.N.J.1985) where the court held that the purported extension of a lease was void and without effect where a Chapter 11 debtor signed a lease extension without the trustee's approval, knowledge and where court approval was not obtained theefor. *Id.* at 263. Defendant's reliance on *Compass Development* is misplaced. The holding in that case hinged on whether the debtor was authorized to act to assume a lease under 11 U.S.C. § 365

---

**5.** The court here notes that *1 Potato 2*, 58 B.R. 752, *Bon Ton*, 52 B.R. 850, and *By Rite*, 55 B.R. 740, all address the assumption issue in relation to 11 U.S.C. § 365(d)(4). These cases are applicable to the herein analysis however, because § 365(d)(4) "is to be read in conjunction with § 365(a) and § 365(b)(1) with regard to the act of assumption." *Bon Ton*, 52 B.R. at 852.

**6.** The court here notes that the question of whether assumption of an executory contract is effective in the absence of a formal motion to assume under § 365 is not before the court.

Thus, the herein conclusions comport with case-law requiring a formal motion to be filed before the expiration of an executory contract, or within the 60–day requirement under 11 U.S.C. § 365(d)(4), in order for assumption to be effective. *See e.g. In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 851 (9th Cir.1987), *cert. denied, Long Beach v. Southwest Aircraft Services, Inc.*, —— U.S. ——, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988); *In re Swiss Hot Dog Co.*, 72 B.R. 569, 572 (D.Colo.1987); *In re Treat Fitness Center, Inc.*, 60 B.R. 878, 879 (9th Cir.Bankr.App.Panel 1986).

without the trustee's knowledge, not whether bankruptcy court approval was a prerequisite to the effective assumption of an agreement prior to the agreement's expiration date.

■■■■■ The court here further rejects defendants' argument that Glassboro is barred from assuming the Option Contract because the debtor caused the Option to terminate prior to filing bankruptcy petitions by virtue of certain breaches committed by the debtor. The question of whether the Option Contract terminated prepetition is governed by state law. *In re Triangle Laboratories, Inc.*, 663 F.2d 463, 471 (3d Cir.1981). *In re Waterkist Corp.*, 775 F.2d 1089, 1091 (9th Cir.1985). Under New Jersey law, an anticipatory breach is a definite and unconditional declaration by a party to an executory contract—through word or conduct—that he will not or cannot render the agreed upon performance. *See Ross Systems v. Linden–Dari–Delite Inc.*, 35 N.J. 329, 341, 173 A.2d 258 (1961). Where a party so governs his conduct as to voluntarily place out of control the power to perform a contract, even though the time for performance has not yet arrived, he is guilty of an anticipatory breach of that undertaking and may be held accountable at both law and equity. *See Union Minerals and Alloys Corp. v. Port Realty & Warehousing Corp.*, 129 N.J.Super. 41, 45, 322 A.2d 192 (Ch.Div.1974). Under New Jersey law, a material breach of a contract on the part of one party entitles the other party to terminate the contract. *Young Travelers Day Camps, Inc. v. Felsen*, 118 N.J.Super. 304, 310, 287 A.2d 231 (Dt.Ct.1972). A material breach is one which goes to the essence of the contract. *Id. See also Medivox Productions, Inc. v. Hoffman–LaRoche, Inc.*, 107 N.J.Super. 47, 75, 256 A.2d 803 (Law Div.1969). Termination of an agreement is thus inappropriate unless an alleged breach is material.

■■■ Defendants' position is that the debtor Glassboro deliberately and repeatedly engaged in conduct which thwarted the purpose of the Option Contract and thereby breached the implied duty of good faith and fair dealings between the parties contained in the subject agreement. Defendants cite two specific actions by the debtor in support of their theory.

First, defendants allege that when the debtor exercised the option to purchase the three acre parcel of land from Teramo in 1984, it did so with the clear understanding that a subdivision would be completed on the property. According to the defendants, the debtor has failed to complete a subdivision on the property which failure has caused (1) Teramo to be assessed additional real property taxes; and (2) Teramo to be deprived of the full benefit of the bargain under the Option Agreement.

Second, defendants argue that the debtor breached the Option Agreement by wrongfully removing a farmer from the Option Property, thereby causing defendants to lose farmer benefits and to be assessed rollback taxes.

The alleged breaches herein do not constitute material breaches because they do not go to the essence of the agreement, which, in this court's view based on a review of this record, was to sell the property and develop a residential community thereon. Accordingly, the court finds defendants' position in connection with the alleged prepetition termination of the Option Agreement to be meritless under New Jersey law. The court instead supports the debtor's position that the alleged breaches constitute, at best, defaults under the Option Agreement.

■■■ The defendants further assert that Paragraph 10 of the Option Contract provides for closing of title on the real estate contract within thirty (30) days from the exercise of the option or at such time and place as the parties can mutually agree. The defendants argue that the debtor Glassboro by its own conduct is unable to perform at such closing by tendering the option price and that such conduct constitutes an anticipatory breach of the option contract. At the November 28, 1988 hearing, counsel for defendants asserted that the debtor had at most 30 days from October 29, 1988 or until November 28, 1988 to close on the option contract. The court here notes that Paragraph 8 of the option

contract provides that "The Optionee may exercise this option at any time during the option period by execution and tender by personal delivery or by mail to Optionor of the real estate sales contract attached hereto as Exhibit B. Optionors shall forthwith execute and deliver to Optionees and [sic] executed copy of said contract within five (5) days." To date the defendants have not returned an executed copy of the contract to the debtors and accordingly have breached this time requirement. In view of this breach this court will not enforce the 30–day requirement against the debtors. Instead the court will direct that settlement shall take place within 30 days from the date that the executed copy of the real estate sales contract is received by the debtors.

### C. Court Approval of the Assumption of the Executory Contract

Notwithstanding the debtor Glassboro's defaults with respect to the Option Agreement, it has met the requirements for the assumption of an executory contract set forth in § 365(b)(1). In order for a debtor to assume a contract under § 365(b)(1), it must: (1) cure existing default or provide adequate assurance that cure will promptly occur, 365(b)(1)(A); (2) compensate any party to the agreement that has suffered actual pecuniary loss as a result of default, or provide adequate assurance of prompt compensation to the injured party, § 365(b)(1)(B); and (3) provide adequate assurance of future performance under the agreement before assumption will be permitted, § 365(b)(1)(c). See LJC Corporation v. Boyle, 768 F.2d 1489 (D.C.Cir.1985).

■ The "cure" or "compensation" contemplated by § 365(b)(1)(A) and (B) allows for something other than immediate cash payment. 2 *Collier on Bankruptcy* ¶ 365.04 at 365–38 (15th ed. 1987). The Bankruptcy Code does not define "adequate assurance"; case law, however, has developed its meaning. Regarding adequate assurance of future performance under § 365(b)(1)(C), the court in *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789 (Bankr.N.D.Ill.1985) observed:

The phrase "adequate assurance of future performance," adopted from section 2–609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr.S.D.N.Y.1982). Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance. *Matter of Luce Industries, Inc.*, 8 B.R. [100] at 107 [ (Bankr.S.D.N.Y.1980) ]. As further stated by the court in *Luce* :

> It is a basic presumption in our system of law that parties to a contract will proceed in good faith in fulfilling their contractual obligations.... Every single detail need not be hammered out and amplified as it seems [the lessor] desires.... Further if necessary, [the lessor] is free to return to this court and seek additional relief, which if instituted by an order to show cause, would receive attention on an expedited basis.

*Id.* at 108.

*Id.* at 803. Citing the court in *Matter of Luce Industries, Inc.*, 8 B.R. 100 (Bankr.S.D.N.Y.1980), *rev'd on other grounds*, 14 B.R. 529 (S.D.N.Y.1981), the *Bon Ton* court further stated:

> Section 365(B)(1) attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain ... Nowhere is the tension between these interests, and the difficulty in striking the balance, more apparent than in trying to determine whether there is the requisite adequate assurance of future performance.

*Id.* (citations omitted).

■ At the hearing of November 28, 1988 on the motions, debtors' counsel represented to the court that debtors would cure all defaults on the Option Agreement at closing, including the outstanding taxes on the three acre parcel of property, and

one-half of the rollback taxes assessed as a result of the ejectment of the farmer from the Option Property. The defendants have not asserted any further pecuniary loss which would entitle them to compensation under § 365(b)(1)(B). The debtors have sufficiently demonstrated to the court that they have secured sufficient funding to purchase the Option Property, and that they are fully prepared to go to closing on the property. While it is clear that the details and approval of that financing is subject to a pending application before this court, the required assurances have been given to approve Glassboro's assumption of the Option Contract.

After due consideration of the debtors' assurances and the fact that without the Option Property debtors' reorganization plans would be severely harmed, the court finds the requirements of § 365(b) satisfied and hereby approves Glassboro's assumption of the Option Agreement at issue.

### D. Specific Performance

The remaining question before the court is whether, given the foregoing conclusions of law, summary judgment should be granted based upon the debtors' specific performance complaint. The Supreme Court of New Jersey set forth the law governing specific performance in the case of *Barry M. Dechtman, Inc. v. Sidpaul Corp.*, 89 N.J. 547 (1982).[7] The question of whether specific performance is appropriate in a given case rests within the sound, equitable discretion of the court. *Id.* at 551–52. The appropriateness of the equitable remedy also depends upon the clarity of the terms of the particular instrument under review, *Id.* at 552. A contract for the sale of land must be sufficiently definite to order specific performance. Whether a contract is sufficiently definite need not depend upon a literal reading thereof; reasonable certainty of terms is sufficient. *Id.* at 552. A contract is sufficiently definite and clear whenever a court can decree with some precision what the defendant must do. *Id.*

It is a well settled equitable principle that contracts for the sale of real property are specifically enforceable by the purchaser. *Pruitt v. Graziano*, 215 N.J.Super. 330, 331, 521 A.2d 1313 (App.Div.1987). "Presumptively, real property is unique and damages at law are an inadequate remedy for breach of a contract to sell. A factual resolution of uniqueness of the real property is immaterial." *Id.* (citations omitted). It is further well established that parties are bound by the agreements they have made. *See Gutch v. Meccia*, 142 N.J.Eq. 430, 433, 60 A.2d 649 (Ch. 1948).

The purpose of summary judgment is to avoid a trial which is unnecessary and results in delay and expense, by promptly disposing of any actions in which there is no genuine issue of material fact. *Tomalewski v. State Farm Life Insurance Co.*, 494 F.2d 882, 884 (3d Cir.1974). Summary judgment is a "drastic remedy" which is not to be granted liberally. *Id. cited with approval in, Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981). A trial court may enter summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Bankr.R. 7056; *See generally Hollinger v. Wagner Mining Equipment Company*, 667 F.2d 402, 405 (3d Cir.1981).

The court must resolve all factual disputes, all doubts as to the existence of genuine issues of material fact, and any inferences that may be drawn from underlying facts against the moving party. *See Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir.1980); *In re Windsor Communications Group, Inc.*, 68 B.R. 1007, 1010 (E.D.Pa.1986).

The party moving for summary judgment has the burden of demonstrating that there exists no genuine issue of material fact. *Fairbanks Morse & Co. v. Consol-*

---

7. *See also First National State Bank of New Jersey v. Commonwealth Federal Savings and Loan Association of Norristown,* 610 F.2d 164, 171–72 (3d Cir.1979) (setting forth the parameters of law governing specific performance in New Jersey).

*idated Fisheries Co.*, 190 F.2d 817, 824 (3d Cir.1951). Some courts have held that whenever there is even the "slightest doubt" regarding the facts of a case, summary judgment may not be granted. *Tomalewski v. State Farm Life Insurance Company, supra*, 494 F.2d at 884.

■■■ The defendants have attempted to raise issues of material fact by way of the submission of a Certification of Eleanor B. Azzari, dated November 21, 1988. Azzari by that Certification asserts:

1. While a deed was prepared and executed by me at the closing of October 29, 1985, the deed was never properly acknowledged or recorded because the Debtor never completed the subdivision on the three (3) acre piece of ground. Although Debtor assumed ownership of that piece and constructed a sample unit on it, the property was never subdivided and, thus, even to date I am being taxed on his improvement and the land involved in that deed. Until a subdivision is completed and approved by the Glassboro Planning Board, I will continue to be taxed for his land and improvements. A Summary Judgment was entered in litigation which was filed in the Superior Court of New Jersey by me to recoup the taxes. Although that Summary Judgment was paid, that only paid taxes to the date of that Judgment and taxes have continued to date. Since the property is not subdivided, these taxes are a lien against the entire parcel of land that I own. If the land is properly subdivided and if the Debtor pays the taxes due to me on that piece of ground to date, I will gladly acknowledge the deed. Until that time, however, I refuse to execute or acknowledge the deed since I have no way of assuring myself that the property will not continue to be taxed to me. At all times with regard to this transaction, it was my understanding that a subdivision would be completed on that three (3) acre parcel. It was never contemplated by me that I would continue to be the owner of it and taxed for the Debtor's property, while he enjoyed the benefit.

2. The Debtor has further breached the Option Contract by actions which he took to remove a farmer with whom I had contracted to farm the property. Had this farmer been able to pursue our agreement, I would have been able to maintain the farmland assessment against the property which taxed me at a much lower rate than the standard rate. The actions of a partner of Glassboro Housing Associates, Krishnamurthy Sankaren, in ejecting the farmer, caused me to lose the farmland assessment and a considerable amount of taxes have been assessed against me. In fact, due to the lack of cash, I have been unable to pay these taxes and at present a tax lien exists against the property in my estimation in excess of $100,000.00.

The facts involving the ejectment of the farmer are not disputed by the debtors herein. Nor, as set forth above, do those actions of the debtor, Glassboro constitute a material breach of the option contract to cause its termination prior to the filing of the debtor, Glassboro's Chapter 11 petition.

In regard to the debtor, Glassboro's, alleged breach of the option contract as a result of its failure to complete the subdivision on the three-acre parcel and the defendants' refusal to acknowledge the corporate grantor signature on the 1984 deed, the debtors presented the deposition testimony of Eleanor B. Azzari, taken November 10, 1988.

At that time, Azzari testified in response to questions asked by Warren J. Martin, Jr., Esquire, attorney for the debtors:

"Q. Mrs. Azzari did there come a time when Teramo entered into negotiations with Glassboro to complete the initial conveyance as that term is defined in the real estate purchase option contract?

"A. Yes.

"Q. And do you recall approximately when that was?

"A. You you mean the three acres we're talking about?

"Q. Right.

"A. I think that was in '84.

"Q. It says approximately three acres which are a part of lot 17, block number 412G. Let me show you what has been marked exhibits P–4 and P–5 which are two deeds.

"A. Right.

"Q. Do you recall when negotiations were entered into to complete the initial conveyance of the three acres?

"A. They had 18 months to do it and I think he paid—it was in '84, I think.

"Q. Okay. Did there come a time when Glassboro Associates completed the initial conveyance?

"A. What do you mean completed? Paid me?

"Q. Did they exercise their rights under the option and pay your consideration?

"A. Yeah, $5,000 for three acres.

"Q. And did you enter into a deed with them for those three acres?

"A. You see it right there.

"Q. Okay. Is that deed marked as P–5?

"A. Yes.

"Q. What is P–4 and how did that come about? Is that an earlier draft of the deed?

"A. I think this was a lease purchase because Mr. Sankaran was dragging his heels and had to get this out before 18 months. This was finalized, I think this was drawn up—what's the date on this? There's no date. When we made settlement on 13 acres in 1985.

"Q. So P–5 you think was drafted in 1985 and—sorry. P–4 was drafted in 1985 by attorney Anderson and P–5 was drafted prior thereto?

"A. No, no, no. Wait a minute.

"Q. Take your time.

"A. I didn't even know this guy at that time. I knew this man. This one I am familiar with.

"Q. Which one?

"A. This one.

"MR. MARTIN: P–5, for the record.

"A. Right. I signed this one.

"Q. And in your understanding, that's the initial conveyance under the paragraph one, sub one of the option agreement?

"A. Yes.

"Q. Let me show you the third page of exhibit P–5 and just ask you to identify your signature.

"A. Yeah, that's my signature.

"Q. Did you acknowledge that signature as well?

"A. I just said yes, that's my signature.

"Q. Okay. Did Teramo Corp. acknowledge your signature on that document?

"A. I'm Teramo Corp.; Eleanor B. Azzari.

"Q. Did you notarize your signature on that document?

"A. I don't see it. Is it notarized?

"MR. MARSHALL [Attorney for the Defendants]: Just answer his question. I can't help you.

"A. Not witnessed.

"Q. Why wasn't it witnessed?

"A. I don't know.

"Q. Okay. Let's go back to looking at the option agreement and let's look under the first page under grant of option, paragraph one, sub two at the bottom of the page. What was your understanding at the time of the use of the word 'lots' in that paragraph?

"A. Lots of property designated by the optionees of ground within the property sufficient for a single family home as approved by the Glassboro Planning Board. It had to go through the approvals.

"Q. Why, to your knowledge, was the word lots in quotes?

"A. I don't know.

"Q. Okay. In your understanding under that paragraph, who has the right to decide what is a lot?

"A. The zoning board.

"Q. Okay. That is your understanding of that paragraph?

"A. Well, final architectural drawings approved by the Glassboro Planning Board.

"Q. Are there any such drawings approved by the Glassboro Planning Board?

"A. As of what time and date?

"Q. As of any time.

"A. Right now?

"Q. Today.

"A. No.

"Q. Were there ever at any time?

"A. Yes.

"Q. What happened to that approval?

"A. Mr. Sankaran go his approvals.

"Q. Let's look at page five of the option agreement at your signature once again on behalf of Teramo Corp. Is your signature notarized on that document?

"A. I think it is. Maybe not on the copy. What do you mean notarized?

"Q. Did a notary public of the State of New Jersey or any other State swear or have you swear or subscribe that you were signing that document?

"A. Not if any of these people were notaries I don't know at that time.

"MR. MARSHALL: Answer his question if you know.

"THE WITNESS: I don't know.

"MR. MARTIN: Okay. Let me make demand to take a look at the original of that document or maybe I have the original.

"MR. MARSHALL: I'm not sure if I have or—I'll look.

MS. SILVERMAN [Attorney for the Debtors]: Off the record a second.

"(A discussion takes place off the record.)

"Q. When you signed documents on behalf of Teramo Corp., is it your ordinary practice to have the documents notarized?

"A. Mr. Gravino was with me. He was my attorney and I did what he told me to do.

"Q. If some documents are notarized and others arn't, it's not any specific—

"A. I go according to what my attorney told me or told me to do and I did what he told me to do. He was there.

"Q. Okay. Let's take a look at paragraph 5A which is handwritten at the bottom of page two of the option agreement.

"A. Yes.

"Q. What's your understanding of that paragraph?

"A. He had to begin construction of modular units on the property within 18 months of the signing of the agreement.

"Q. To your understanding or knowledge, was paragraph 5A complied with?

"A. Yes.

"Q. Let's take a look at paragraph eight. We're still on P–1. To your knowledge, what is necessary for Glassboro Housing Associates to do in order to exercise the option?

"A. Whatever it says there.

"Q. Fine. Let's take a look at paragraph ten; specifically paragraph ten, sub paragraphs two and three. What is your understanding of those paragraphs?

"A. The master option described above will be treated as it may be exercised as a group of individual options as—an option per each lot and one option for the initial conveyance.

"What do you want me to answer? What is the question? Would I understand it?

"Q. Do you understand it?

"A. Yes, I understand it.

"Q. How about the following paragraph, three.

"A. Three?

"Q. Yes.

"A. Yeah. I understand that.

"Q. So, in your opinion, make Glassboro Housing Associates exercise its option piecemeal in any owner or in any manner as Glassboro Housing Associates wishes as long as they do it prior to the expiration date?

"A. As of October 29, 1983. Whatever the circumstances were at that time. Yes."
(Deposition of November 10, 1988, pp. 22–29).

Mere allegations, and denials, that a contract was breached, that a fraud was committed, or that some fiduciary duty was breached do not alone establish the existence of a genuine dispute of material fact. Such allegations and denials thereof merely frame the ultimate issues to be determined by applying the relevant rules of law to establish fact. *See Radobenko v. Automated Equipment Corporation,* 520 F.2d 540, 543 (9th Cir.1975). The *Radobenko* court noted:

> When confronted with the question of whether a party should be allowed to create his own issue of fact by an affidavit contradicting his prior deposition testimony, the Court of Appeals for the Second Circuit held that no *genuine* issue of fact was raised. *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969). Therein the Court noted:
>
> > "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." 410 F.2d at 578.
>
> 520 F.2d at 544.

A party cannot create an issue of fact simply by raising arguments contradicting his own prior statements and representations. *See Id. See also Mosier v. Insurance Company of North America,* 193 N.J.Super. 190, 195, 473 A.2d 86 (App. Div.1984). It is only genuine issues of fact and not simply issues created by self-contradictions of an opposing party that are intended to preclude resort to the device of summary judgment. *Id.*

Here the court is satisfied that the issues of fact created by Azzari's affidavit are not issues that this court could reasonably characterize as genuine, and should not subject the defendants to the burden of a trial. Thus, the court finds that there are no genuine issues as to any material fact.

The record before this court clearly indicates that the defendants have materially and substantially breached the Option Agreement by refusing to execute and return the Real Estate Agreement to the debtors and by failing to convey the Option Property to the debtors. The record further clearly indicates that the Option Agreement is definite and certain as to the parties, subject matter, delivery and price terms, and is thereby capable of being specifically enforced.

Accordingly, the court shall enter judgment (1) denying the motion by the defendants for summary judgment in their favor and against the debtors; (2) granting summary judgment in favor of the debtors thereby compelling the defendants Eleanor B. Azzari and Teramo Corporation to specifically perform pursuant to the Option Contract dated October 29, 1983; (3) ordering Eleanor B. Azzari and Teramo Corporation to execute and deliver back to Glassboro Housing Associates the real estate contract forwarded to them by Glassboro on October 11, 1988 within five (5) days of this date; (4) ordering Eleanor B. Azzari and Teramo Corporation to appear and deliver title to Glassboro at a closing to take place at the offices of debtors' counsel within 30 days of the date that the debtors receive the executed copy of the real estate contract; and (5) ordering Eleanor B. Azzari and Teramo Corporation to acknowledge and notarize the signature of the corporate grantor of the 1984 deed to Glassboro within ten (10) days of the date hereof.

The court shall also enter an order finding that Glassboro exercised and assumed the Option Contract by and between Teramo Corporation and Robert G. Welch, or his assignee, dated October 29, 1983, which option was subsequently assigned to Glassboro; and approving Glassboro's assumption of said Option Contract pursuant to 11 U.S.C. § 365.

Orders in accordance with this decision shall be submitted.