In re BROAD ASSOCIATES LIMITED PARTNERSHIP, Debtor.

Bankruptcy No. 5–89–01070.

United States Bankruptcy Court, D. Connecticut.

July 30, 1991.

James Berman, Craig I. Lifland, Zeisler & Zeisler, P.C., Bridgeport, Conn., for debtor.

Grant T. Stein, Alston & Bird, Atlanta, Ga., Gregory W. Nye, Hebb & Gitlin, Hartford, Conn., for Pacific Mut. Life Ins. Co.

## MEMORANDUM AND ORDER ON CONFIRMATION OF DEBTOR'S THIRD AMENDED PLAN AS MODIFIED

ALAN H.W. SHIFF, Bankruptcy Judge.

### I.

The debtor, a Connecticut limited partnership, purchased a commercial office building located at 300 Broad Street, Stamford, Connecticut (the "building"), in December, 1986, from HAB Stamford Associates for $8,000,000.00. The purchase was made subject to a $5,050,000.00 note dated June 14, 1985 (the "Pacific note"), which is secured by a first mortgage on the building; an assignment of the leases, rents, and profits of the building; and a perfected security interest in certain personal property of the debtor.

In August, 1988, the debtor defaulted on the Pacific note; in November, 1988, Pacific Mutual Life Insurance Company ("Pacific") commenced a foreclosure action in Connecticut Superior Court; and on February 14, 1989, the state court entered a judgment of strict foreclosure and established September 6, 1989 as the debtor's law day. On September 5, 1989, the debtor filed a petition under chapter 11 of the Bankrupt-

cy Code. The parties have stipulated that on that date $5,983,000.00 in principal, interest, and fees was due on the Pacific note. On November 17, 1989, Pacific filed an election pursuant to Code § 1111(b)(1)(A)(i), thereby making its entire claim secured under § 1111(b)(2).[1] On February 28, 1990, an order entered granting Pacific's motion for relief from the automatic stay under Code § 362(d)(2). *In re Broad Assoc. Lim. Partnership*, 110 B.R. 632 (Bankr.D.Conn.1990), *aff'd*, Doc. No. 90–170, 1990 WL 293699 (D.Conn., Cabranes, J., July 20, 1990).[2] Familiarity with that order is assumed.

On April 18, 1990 and December 20, 1990, the debtor filed a Third Amended Plan of Reorganization and Modification to Third Amended Plan of Reorganization, respectively (collectively "the Plan"). Under the Plan Class 1 consisted of "[a]ll allowed secured claims" of Pacific, which were to be treated as follows:

In full, complete and final satisfaction of Class 1 creditors, the Debtor shall pay to said claimant the present value of $2,700,000.00 with interest at ten (10%) percent in equal quarterly installments over fourteen years which stream of payments shall not exceed the face amount of Pacific Mutual's Allowed Claims. The first payment shall be made ninety (90) days after the Distribution Date.[3] Coter-

minous with the last interest payment, Pacific Mutual shall receive a lump sum payment to satisfy the balance of its Allow [sic] Claim. Pacific Mutual shall retain its liens against the Realty until paid in full under the Plan, but the Debtor shall be permitted to use rent proceeds for operations and payments under the Plan.

Article IV, ¶ 4.01; Art. VI, ¶ 6.01. On January 4, 1991, Pacific filed an objection to the Plan, contending, *inter alia*, that its treatment was not fair and equitable. On February 8, 1991, an order entered which enjoined Pacific from proceeding with its state court foreclosure action and provided:

[S]hould this court, following hearing and decision, fail to confirm Debtor's Third Plan of Reorganization, as modified, presently scheduled to be heard on February 28, 1991 and March 1, 1991, (i) the within case shall be dismissed with prejudice; and (ii) the Debtor shall consent to and file with the Connecticut Superior Court in *Pacific Mutual Life Insurance Company vs. Broad Associates Limited Partnership, et al*, Docket No. CV–88–0097490–S, a Motion for Judgment in Accordance with Stipulation and Stipulated Judgment, pursuant to which the Debtor shall consent to the entry of a Judgment of Strict Foreclosure and the entry of an immediate law day, which

1. Code § 1111(b) provides in part:

(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection....
....

(2) If such an election is made, then notwithstanding section 506(a) of this title such claim is a secured claim to the extent that such claim is allowed.

The Pacific note specifies that Pacific does not have recourse against the debtor so that it was entitled to make the § 1111(b) election. *See* 11 U.S.C. § 1111(b)(1)(B)(ii).

2. Code § 362(d) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
....

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

3. Paragraph 2.10 of the Plan defines "Distribution Date" as "the later of the Effective Date or within twenty (20) days after the ... entry of a final non-appealable order providing for the allowance of claims if an objection to a claim is pending on the Effective Date." Paragraph 2.11 defines "Effective Date" as "the date the order confirming the Plan becomes final and non-appealable."

law day shall be one day after said Motion is heard and determined.

On April 9, 1991, an order entered finding, *inter alia*, that the building had a value of $2,700,000.00 and that the Plan's treatment of Pacific's secured claim was not fair and equitable under § 1129(b)(2)(A)(i)(II) [4] because the present value of the proposed payments to Pacific did not total $2,700,000.00. Accordingly, the Plan was not confirmed. *See In re Broad Assoc. Lim. Partnership*, 125 B.R. 707 (Bankr.D.Conn.1991). Familiarity with that order is assumed.

On April 10, the debtor filed a Modification to the Plan which treated Pacific's secured claim as follows:

> In full, complete and final satisfaction of Class 1 creditors, the Debtor shall pay to said claimant the present value of $2,700,000.00 with interest at 10% in equal quarterly installments over fourteen years and, *coterminous* with the last payment, Pacific Mutual will receive $2,700,000.00 so that Pacific Mutual will receive the present value of $2,700,000.00 and not less than its Allowed Claim. Pacific Mutual will retain its liens against the realty until paid in full under the Plan, but the Debtor shall be permitted to use rent proceeds for operations and payments under the Plan. The first interest payment shall be made ninety days after the Distribution Date.

The Modification also stated that "[t]he purpose of this amendment is to make certain that the mathematical formula for payment is consistent with the proposition set forth in the Plan that 'the Debtor shall pay to said claimant the present value of $2,700,000.00 with interest at 10%.'"

On April 10, the debtor also filed a motion for a determination that the Modification would not adversely affect creditors, an emergency confirmation hearing on the Plan with the Modification, and a stay to prevent Pacific from proceeding with its state court foreclosure action until that confirmation hearing was concluded. On April 15, Pacific filed a motion for the enforcement of the February 8 order and the dismissal of this case with prejudice. On April 16, I entered an order finding that there was an inconsistency between what the Plan stated the debtor would do, *i.e.*, "pay to said claimant the present value of $2,700,000.00," *see* Art. VI, ¶ 6.01, and its statement of how the debtor would make that payment, as the present value of the payments described would not total $2,700,-000.00. *In re Broad Assoc. Lim. Partnership*, Case No. 5–89–01070, Doc. No. 168 (Bankr.D.Conn., Shiff, J., Apr. 16, 1991). I therefore concluded that the Plan was ambiguous, that the Modification was no more than a clarification of the Plan and therefore not prohibited by the February 8 order, and that parol evidence was admissible to determine whether the debtor intended to pay Pacific the present value of $2,700,-000.00 as required by § 1129(b)(2)(A)(i)(II) or no more than the face amount of its

---

**4.** A chapter 11 plan may be confirmed only if all of the requirements of § 1129(a) are met. Section 1129(a)(8) provides:

> (8) With respect to each class of claims or interests—
> (A) such class has accepted the plan; or
> (B) such class is not impaired under the plan.

However, § 1129(b) provides:

> (1) ... [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (A) With respect to a class of secured claims, the plan provides:
> ....
> [i](II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property....

Thus, Pacific must receive payments totalling at least the allowed amount of its claims *and* at least the present value of the collateralized portion of its claims.

$5,983,000.00 allowed claim.[5]

## II.

 The instant controversy is governed by principles of contract construction. *In re RBS Indus., Inc.*, 115 B.R. 419, 421 (Bankr.D.Conn.1990); *Matter of United Merchants and Manufacturers, Inc.*, 24 C.B.C. 220, 226 (Bankr.S.D.N.Y.1981) ("At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following serious and frequently protracted negotiations. In many of its most vital aspects, a plan is a kind of contract involving, as it does, matters of offer, acceptance, performance and the like."). Contracts must be interpreted to effectuate the intent of the parties. *Barnard v. Barnard*, 570 A.2d 690, 696 (Conn. 1990); *Sturman v. Socha*, 191 Conn. 1, 10, 463 A.2d 527 (1983). In general the parties' intent is to be determined from the language of the contract, *Sturman, supra*, 191 Conn. at 10, 463 A.2d 527, but a writing which includes facially incompatible terms is necessarily ambiguous. *In re RBS Indus., Inc.*, 115 B.R. 417, 418 (Bankr. D.Conn.1990). To resolve such ambiguity, a court must examine not only the language used in the writing, but also the circumstances surrounding the making of the contract and the motives of and purposes sought to be accomplished by the parties. *Barnard, supra*, 570 A.2d at 696; *Connecticut Co. v. Division 425*, 147 Conn. 608, 616, 164 A.2d 413 (1960). Moreover, if the terms of a writing are facially susceptible to two or more constructions, the one which is the more rational, reasonable, and equitable is preferred. *Lanna v. Greene*, 175 Conn. 453, 458–59, 399 A.2d 837 (1978); *Texaco, Inc. v. Rogow*, 150 Conn. 401, 408, 190 A.2d 48 (1963). Contract language is typically construed most strongly against the drafter, *Sturman, supra*, 191 Conn. at 9, 463 A.2d 527, but that rule of construction "tilts the balance ... whenever two interpretations of a contractual provision seem *equally* possible." *Ravitch v. Stoll-*

*man Poultry Farms, Inc.*, 165 Conn. 135, 145–46, 328 A.2d 711 (1973) (emphasis added). *See also Texaco, Inc., supra*, 150 Conn. at 408–09, 190 A.2d 48 (the rule that the more equitable, reasonable and rational interpretation is preferred "cannot be rendered ineffective in this case by the general rule that, where there is an ambiguity, the lessee is favored.... This general rule does not mean that any solution of a claimed ambiguity, if proposed by a lessee, should prevail.").

 After considering the testimony of the debtor's attorney and one of its general partners, as well as the purpose of the Plan and the circumstances surrounding its drafting, I conclude that the two potential interpretations of the Plan are not equally possible. The debtor's attorney testified that the debtor intended to pay Pacific the present value of their $2,700,000.00 secured claim, as was stated in Art. VI, ¶ 6.01 of the Plan, and that the failure of the proposed method of payment to provide for the appropriate amount was due to a mistake. One of the debtor's general partners testified that it was the debtor's intent to pay Pacific the present value of $2,700,-000.00, that he instructed the debtor's attorney to prepare a plan that would reflect that, and that the debtor is willing to pay whatever amount is necessary to satisfy the requirements of the Code.

Logic buttresses that testimony. Under the Plan without the Modification, the debtor proposed to pay Pacific a present value of $2,575,307.60, or 95.4% of the required $2,700,000.00. The debtor could have made and now proposes to make up the shortfall by increasing the lump sum payment in fourteen years by approximately $500,-000.00, which would have a present value of $125,000.00, a small amount relative to the much larger amount of money it was proposing to pay over the fourteen years. I therefore conclude that debtor intended to do what was necessary to have its Plan confirmed, *i.e.*, it intended to pay Pacific

---

**5.** *See LTV Corp. v. Aetna Casualty and Surety Co. (In re Chateaugay Corp.)*, 116 B.R. 887, 903 (Bankr.S.D.N.Y.1990) ("When the terms [of a contract] are ambiguous or subject to interpre-tation by the parties, parol evidence may be admitted to determine the contract's meaning."); *In re RBS Indus., Inc.*, 115 B.R. 417, 418 (Bankr. D.Conn.1990).

the present value of $2,700,000.00 and that its failure to accomplish that objective was in the nature of a ministerial error.[6]

Under the modification, the lump sum payment at the end of the fourteen year period payment is increased to $2,700,-000.00 from $2,203,000.00. That change will increase the present value of the total payments by approximately $125,000.00. As noted in the April 9 order, the present value of the debtor's proposed payments were insufficient by approximately $125,-000.00.[7] Therefore, the debtor has satisified § 1129(b)(2)(A)(i)(II).

### III.

As noted *supra* at 329–330, the failure to satisfy § 1129(b)(2)(A)(i)(II) was the only defect in the Plan. The Modification remedies that defect, the Plan with the Modification is therefore CONFIRMED, and IT IS SO ORDERED.

---

**6.** Moreover, although this decision does not turn on this observation, since there is a reasonably strong prospect that the property will be sold before the lump sum payment is due in fourteen years, it is likely that the relatively small difference between what was offered and what would be needed to give Pacific the present value of its claim was the result of computation error, not an intention to pay less.

**7.** The present value of the lump sum payment prior to the Modification was $552,684.40:

The present value of the lump sum payment under the Modification is $677,370.80:

The shortfall was precisely $124,692.40, and the increase in the present value of the payments is $124,686.40. However, such discounted future cash flow calculations are necessarily imprecise, relying as they do on predictions of future conditions, and I find that the debtor has satisfied § 1129(b)(2)(A)(i)(II).